James C. WOOD, Jr., ex rel. UNITED STATES of America, Appellant,

v.

THE AMERICAN INSTITUTE IN TAIWAN, et al., Appellees.

No. 01–5092.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 2002.

Decided April 16, 2002.

Wm. Paul Lawrence, II argued the cause for appellant. With him on the briefs was Bradley S. Weiss.

Douglas N. Letter, Litigation Counsel, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, R. Craig Lawrence and Lydia Kay Griggsby, Assistant U.S. Attorneys.

Before: TATEL and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this case, we must determine whether the American Institute in Taiwan, a unique entity through which the United States performs consular services on Taiwan and conducts commercial, cultural, and other relations with the people on Taiwan, enjoys sovereign immunity from a *qui tam* suit brought by the Institute's former Managing Director. Agreeing with the district court that the Institute is immune, we affirm the dismissal of the complaint.

## I.

Following the triumph of Mao Zedong's 1949 communist revolution, Chiang Kai-Shek, leader of China's defeated Nationalist party, fled to Taiwan with two million loyalists. The United States declined to recognize the new People's Republic of China, continuing instead to recognize the Nationalists as the official leaders of the Chinese government. This arrangement lasted until several years after President Richard Nixon's historic visit to China when, in 1978, the United States established diplomatic relations with the People's Republic.

As a condition of normalizing relations with the United States, the People's Republic insisted on recognition as "the sole legal government of China," stating its "firm[] oppos[ition] [to] any activities which aim at ... an[] 'independent Taiwan.'" DEP'T ST. BULL., Mar. 20, 1972, at 435, 437 (setting forth text of Shanghai Communique). Because the United States wished to maintain relations with Taiwan that would not be unacceptable to the People's Republic, Congress passed the Taiwan Relations Act of 1979, which replaced official recognition of Taiwan with "relations between the people of the United States and the people on Taiwan." 22 U.S.C. § 3301(b)(1). In addition to "preserv[ing] and promot[ing] commercial, cultural, and other relations" with the people on Taiwan, *id.,* Congress sought to protect the United States' ongoing interest in "peace and stability in the area," *id.* § 3301(b)(2), and in the determination of Taiwan's future by "peaceful means," *id.* § 3301(b)(3), (4); "to provide Taiwan with arms of a defensive character," *id.* § 3301(b)(5); and to prevent threats to "the security, or the social or economic system, of the people on Taiwan," *id.* § 3301(b)(6). As Senator Church, the sponsor of the bill that became the Taiwan Relations Act, explained, Congress wanted to "make[] clear to the people on Taiwan that we are not abandoning them" while "simultaneously developing a mutually beneficial relationship with the People's Republic of China." 125 CONG. REC. 6709 (1979).

To facilitate this new and sensitive set of relations, the Taiwan Relations Act created appellee the American Institute in Taiwan. Given that the United States no longer had an embassy on or ambassador to Taiwan, the Institute became the entity through which "the people of the United States" and "the people on Taiwan" maintain "extensive, close, and friendly commercial, cultural, and other relations." 22 U.S.C. § 3301(a)(2), (b). The Act establishes the Institute as "a nonprofit corpo-

ration incorporated under the laws of the District of Columbia or . . . such comparable successor nongovernmental entity as the President may designate." *Id.* § 3305(a)(1)–(2). The Act "preempt[s]" any "law, rule, regulation, or ordinance of the District of Columbia" "[t]o the extent" it "impedes or otherwise interferes with the performance of the functions of the Institute pursuant to [the Act]." *Id.* § 3305(c).

The Taiwan Relations Act gives the Institute two primary functions, both of which are to be carried out "in the manner and to the extent directed by the President." *Id.* § 3305(a), (b). First, the Institute "conduct[s] [and] carrie[s] out" "[p]rograms, transactions, and other relations conducted or carried out by the President or any agency of the United States Government with respect to Taiwan." *Id.* § 3305(a). Second, the Institute "enter[s] into, perform[s], [and] enforce[s]" any "agreement or transaction" of the President or any federal agency "relative to Taiwan." *Id.* § 3305(b). The Institute also provides services to federal agencies, *id.* § 3308, and performs "acts such as are authorized to be performed outside the United States for consular purposes," *id.* § 3306(a)(3); acts performed in this latter connection "shall be valid, and of like force and effect within the United States, as if performed by any other person authorized under the laws of the United States to perform such acts," *id.* § 3306(b). The United States Comptroller General may audit the Institute's books with respect to any funds made available to the Institute by federal agencies. *Id.* § 3308(c).

The President delegated the lion's share of his authority over the Institute to the Secretary of State. *See* Exec. Order No. 12,143, 44 Fed.Reg. 37,191 (June 22, 1979), *superseded by* Exec. Order No. 13,014, 61 Fed.Reg. 42,963 (Aug. 15, 1996). Under the Institute's bylaws, the Secretary ap-

points and "may . . . remove[ ] [the Trustees] at any time, with or without cause." *James Wood ex rel. United States of America v. Am. Inst. in Taiwan,* No. 98–1952, slip op. at 13 (D.D.C. Feb. 28, 2001) (quoting United States' Mem. Supp. Mot. to Dismiss at 6 n.3 (quoting Institute bylaws)) (internal quotation marks omitted). The Board of Trustees appoints both a Chairperson and a Managing Director, *see id.,* and " 'manage[s] and conduct[s]' " the Institute's " 'business and affairs . . . in accordance with the bylaws,' " Appellant's Br. at 8 (quoting Institute Articles of Incorporation).

The Institute carries out its statutory responsibilities pursuant to a contract with the State Department. Under that contract, the Institute performs "consular and other functions in Taiwan . . . . normally performed by the . . . [State Department] and other U.S. agencies at United States foreign diplomatic posts." Compl. ¶ 14. Among other things, the Institute processes visa applications from foreign nationals and provides travel-related services for Americans. The Institute contracts with other government agencies to provide "services . . . similar to those . . . provided by federal [embassy] employees prior to the time the United States terminated diplomatic relations with Taiwan." *Id.* ¶ 13. For example, the Institute conducts trade shows on behalf of the Department of Commerce. The Institute has also entered into a number of agreements with the Taipei Economic and Cultural Representative Office in the United States, "the instrumentality established by the people on Taiwan having the necessary authority . . . to . . . take . . . actions on behalf of Taiwan in accordance with the [Taiwan Relations] Act," Exec. Order No. 13,014, 61 Fed.Reg. at 42,964, concerning such matters as customs, energy, intellectual property rights, taxation, and trade, *see* Agreements in Force as of December 31,

1997 Between the American Institute in Taiwan and the Taipei Economic and Cultural Representative Office in the United States, 63 Fed.Reg. 71,507 (Dec. 28, 1998).

Over half of the Institute's approximately $36 million in annual revenue derives from the State Department contract. Most of the remainder comes from either visa processing fees or contracts with other federal agencies. Between $1.4 and $1.5 million comes from trade shows.

Appellant James Wood served as the Institute's Managing Director and chaired its Board of Trustees from 1995 to 1997. Wood alleges that during his tenure, he discovered that the Institute had defrauded the United States by making false claims for payment under the State Department contract to the tune of some $5.3 million. According to Wood, Institute personnel accomplished this fraud by embezzling visa processing fees and submitting false reports to the State Department. In order to cover operating expenses, he alleges, the Institute offset the embezzled amount by drawing additional funds from the State Department contract. Wood claims that when he reported the alleged fraud to the State Department, the Trustees and State Department officials embarked on a "campaign of retaliation, discrimination and intimidation" against him, ultimately forcing him to resign. Compl. ¶ 87.

Wood then filed a *qui tam* suit under the False Claims Act, 31 U.S.C. § 3730, in the United States District Court for the District of Columbia. The False Claims Act permits a private person, known as the "relator," to bring "a civil action ... for the person and for the United States Government ... in the name of the Government," *id.* § 3730(b), against any "person who ... knowingly presents, or causes to be presented, to [the federal government] ... a false or fraudulent claim for payment or approval," *id.* § 3729(a)(1). The relator

shares in any financial recovery. *Id.* § 3730(d). In addition to the *qui tam* claim, Wood's complaint asserts retaliatory discharge "because of lawful acts done ... in furtherance of ... [the *qui tam*] action." *Id.* § 3730(h).

Declining to intervene in Wood's suit, the United States, on behalf of the Institute, moved to dismiss on the grounds of sovereign immunity. The district court denied Wood's motion for discovery and an evidentiary hearing on the issue, concluded that the Institute "is an arm of the sovereign ... for purposes of [the Institute's] claim of sovereign immunity under the [False Claims Act]," *Wood*, No. 98–1952, slip op. at 17, and dismissed the complaint. Wood now appeals, challenging the district court's sovereign immunity determination as well as its denial of discovery.

## II.

The Institute describes itself as an "agency or instrumentality" of the United States not subject to suit under the False Claims Act. Disagreeing, Wood argues that Congress's decision to create the Institute as a "nonprofit corporation incorporated under the laws of the District of Columbia, or ... comparable successor nongovernmental entity," 22 U.S.C. § 3305(a)(1)–(2), demonstrates that the Institute is not a governmental entity enjoying sovereign immunity, but rather a private corporation providing services to the government. Wood likens the Institute to Radio Free Europe/Radio Liberty, the American National Red Cross, and Amtrak, three corporations created by the federal government and chartered under state or District of Columbia law that courts have held (or observed in dicta) are not part of the government for some purposes. *See Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1124–25 (D.C.Cir.1985) (holding that Radio Free Europe/Radio Liberty is

not a "government controlled corporation" within the meaning of the Age Discrimination Employment Act); *Marcella v. Brandywine Hosp.*, 47 F.3d 618, 622–24 (3d Cir.1995) (holding that Red Cross is not part of the government for the purpose of immunity from jury trials in personal injury suits, although Red Cross is "virtually ... an arm of the [federal] government" entitled to immunity for some purposes, including state taxation (internal quotation marks and citation omitted)); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 391–92, 400, 115 S.Ct. 961, 970–71, 974–75, 130 L.Ed.2d 902 (1995) (noting in dictum that the statutory provision that Amtrak "will not be an agency or establishment of the United States government" "no doubt ... deprives Amtrak of sovereign immunity from suit," but holding that Amtrak is "part of the Government" for First Amendment purposes (internal quotation marks and citation omitted)).

■■■ Although certainly relevant to the issue of sovereign immunity, the Institute's nonprofit corporate status is hardly dispositive. Relying on the Institute's status alone would ignore the governmental nature of its responsibilities and the extensive control the government exerts over Institute operations. *Cf. Lebron*, 513 U.S. at 400, 115 S.Ct. at 974–75 (holding that Amtrak is "part of the Government for purposes of the First Amendment" because the government created Amtrak "by special law" to further "governmental objectives" and retained authority to appoint a majority of Amtrak's corporate directors). Indeed, the Institute has no role other than promoting and conducting relations "between the people of the United States and the people on Taiwan," a role it performs through governmental-type activities such as processing visa applications, providing consular services, and entering into agreements regarding customs and trade. Wood himself describes the Institute as performing activities that not only are "normally performed" by the State Department "at ... foreign diplomatic posts," Compl. ¶ 14, but are also similar to those "provided by federal [embassy] employees prior to the time the United States terminated diplomatic relations with Taiwan," *id.* ¶ 13.

Under the Taiwan Relations Act, moreover, the Institute carries out its core statutory functions—"programs," "transactions," and "agreements"—as well as "services" to federal agencies, "in the manner and to the extent directed by the President," 22 U.S.C. § 3305(a), (b), or "upon such terms and conditions as the President may direct," *id.* § 3308(b). Although the Trustees "'manage[ ] and conduct[ ]'" the Institute's "'business and affairs,'" Appellant's Br. at 8 (quoting Institute Articles of Incorporation), the Secretary of State retains ultimate control over the Trustees through the power of appointment and removal at will. As Wood conceded at oral argument, the Institute may undertake no "activities ... inconsistent with U.S. government policy." Tr. of Oral Arg. at 13. Were this not the case, we cannot imagine how acts of Institute employees could ever have the same "force and effect" as "acts ... for consular purposes.... performed by any other [authorized] person." 22 U.S.C. § 3306(a)(3), (b).

Put simply, though not an embassy, the Institute functions like one. In Wood's words, the Institute "carr[ies] out U.S. foreign policy." Appellant's Br. at 9. The Institute thus differs quite significantly from Radio Free Europe/Radio Liberty and the Red Cross. Finding Radio Free Europe/Radio Liberty not a governmental entity for ADEA purposes, we emphasized that the corporation, though required to carry programming "consistent with" U.S. foreign policy, operates under an express statutory mandate to

remain "an independent broadcast media"; it thus retains "independence in programming and broadcasting decisions" and "day-to-day ... operational control." *RFE/RL*, 770 F.2d at 1125–26 (internal quotation marks and citation omitted). Likewise, in concluding that the Red Cross is not the government for purposes of immunity from jury trials, the Third Circuit thought it important that the Red Cross, in order "to properly fulfill its role ... in international ... activities[,] ... must be independent of the United States government," and that the government "does not manage the [Red Cross's] day-today activities." *Marcella*, 47 F.3d at 624. "Independence" is not a word one associates with the Institute. Indeed, the Institute's foreign policy mission requires a fundamental *lack* of independence from U.S. government control.

*Lebron* also differs from this case. There, the Supreme Court held that Amtrak *is* "part of the Government" for First Amendment purposes. 513 U.S. at 400, 115 S.Ct. at 974. To be sure, the court stated that Amtrak enjoys no sovereign immunity, *id.* at 392, 115 S.Ct. at 971, but that observation, in addition to being dictum, rested on a provision in the "authorizing statute ... that ... [Amtrak] 'will not be an agency or establishment of the United States Government,'" *id.* at 391, 115 S.Ct. at 970 (quoting the Rail Passenger Service Act of 1970, 84 Stat. 1330). In contrast, when Congress used the words "nongovernmental entity" in the Taiwan Relations Act, it did not create an independent corporation like Amtrak. Instead, Congress established a vehicle through which the United States could accomplish two seemingly inconsistent objectives: fulfill its commitment to the People's Republic to end official ties with Taiwan, yet maintain relations with the "people on Taiwan" through consular, commercial, and cultural activities—even arms sales. To hold, as Wood urges, that the Institute is

not part of the government would ignore this central foreign policy mission.

*Galvan v. Federal Prison Industries* reinforces our belief that the Institute, notwithstanding its nonprofit corporate status, remains very much part of the federal government. 199 F.3d 461 (D.C.Cir.1999). *Galvan* involved a *qui tam* suit against the Federal Prison Industries, an entity created by Congress to provide work opportunities for federal inmates. *Id.* at 462. Pointing out that FPI is a "wholly owned government corporation," and that its revenues are deposited in the United States Treasury, we held that the suit was "against the sovereign" because "any judgment in [the *qui tam* relator's] favor would require FPI to pay damages directly from the public treasury." *Id.* Although Institute funds are not held in the United States Treasury, "[d]iversion of resources from a private entity created to advance federal interests has effects similar to those of diversion of resources directly from the Treasury." *Id.* (internal quotation marks and citation omitted). A False Claims Act judgment against the Institute would have one of two consequences for the government: either the government would have to make up the loss (as Wood says it did with respect to the $5.3 million in allegedly embezzled funds), or it would have to adjust its relations with the "people on Taiwan," as the Act makes the Institute the sole entity through which the United States conducts such relations. Wood's suit is "against the sovereign," in other words, because the "'judgment sought would expend itself on the public treasury or domain, or interfere with the public administration.'" *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (quoting *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012–13, 91 L.Ed. 1209 (1947)).

Insisting that a False Claims Act judgment against the Institute would have no effect on the Treasury, Wood claims that some Institute revenues—visa fees and funds generated from trade shows, for example—come from what he calls "independent sources" and could be used to pay the judgment. Appellant's Br. at 29. We disagree. The Institute issues visas and conducts trade shows pursuant to State and Commerce Department contracts through which it fulfills its statutory responsibility to "promote ... commercial, cultural, and other relations between the people of the United States and the people on Taiwan." 22 U.S.C. § 3301(b)(1). Revenues generated by these activities, moreover, offset funds the federal government would otherwise have to provide for the Institute to fulfill its statutory and contractual obligations. And at oral argument, Wood conceded that, were the Institute to close its doors and liquidate its assets, any remaining funds would go to the federal government. Put another way, it makes little difference from the government's perspective whether a False Claims Act damages award is paid out of visa and trade show revenues or from funds received from the State Department or other federal agency—the effect on the Treasury is essentially the same.

■■■ Wood next argues that even if the Institute is part of the government, Congress waived sovereign immunity because under D.C. law a nonprofit corporation "shall have power ... to sue and be sued, complain, and defend, in its corporate name." D.C. CODE § 29–301.05 (West 2001). "A waiver of the federal government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Peña*, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996) (internal citations omitted). We construe statutory ambiguity in favor of immunity: "So long as a statute supposedly waiving immunity has a 'plausi-

ble' non-waiver reading, a finding of waiver must be rejected." *Galvan*, 199 F.3d at 464 (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 1016, 117 L.Ed.2d 181 (1992)).

Although *FDIC v. Meyer* holds that a sue-and-be-sued clause represents a "broad waiver" of sovereign immunity, 510 U.S. 471, 475, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994) (internal quotation marks and citation omitted), this case differs from *Meyer* in a significant respect: In *Meyer*, the federal statute creating the FDIC contained the sue-and-be-sued clause, while the clause in this case appears not in the Taiwan Relations Act, but in the D.C.Code. Given the presumption against waiver, we must therefore determine whether the Taiwan Relations Act has a "plausible non-waiver reading"—that is, can we plausibly read the Act to exempt the Institute from the sue-and-be-sued clause? *See Galvan*, 199 F.3d at 464–66 (analyzing organic statute to determine whether it could plausibly be read as rendering D.C.Code's "sue and be sued" clause inapplicable).

Arguing that Congress intended the clause to apply to the Institute, Wood points to *Sloan Shipyards v. United States Shipping Board Emergency Fleet Corp.*, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762 (1922). There, the Supreme Court found that a corporation formed by the United States Shipping Board enjoyed no sovereign immunity, *id.* at 566–68, 42 S.Ct. at 388–89, because, as a D.C. corporation, it had "the capacity to sue and be sued," *id.* at 565, 42 S.Ct. at 388. Although like the corporation in *Sloan Shipyards*, the Institute is incorporated under D.C. law, the Taiwan Relations Act adds an additional wrinkle by way of the preemption clause, which bars application of any provision of D.C. law that "impedes or otherwise interferes with the [Institute's] performance."

22 U.S.C. § 3305(c). "Impede" the Institute's performance or "otherwise interfere" with it is exactly what a False Claims Act judgment would do. As we explained, the United States would either have to make up any losses resulting from such an award or live with any negative foreign policy consequences that might flow from having to modify or reduce the Institute's exclusive role. Because we can thus plausibly read the Act to preempt the D.C.Code's sue-and-be-sued clause, Congress has not waived the Institute's sovereign immunity.

Contrary to Wood's claim, our conclusion does not leave the Institute free to operate in a "basically unregulated" "no-man's land." Tr. of Oral Arg. at 14. The Comptroller General may audit the Institute's books. 22 U.S.C. § 3308(c). The State Department's Inspector General has jurisdiction to investigate the Institute's operations and finances, as does the Inspector General of every federal agency with which it contracts. *See* 5 U.S.C.App. 3 §§ 1–12 (Inspector General Act). Even with sovereign immunity, therefore, the Institute is hardly free from government oversight. That oversight may not be what Wood prefers, but the fact remains that some of the government's most powerful watchdog agencies may investigate the Institute and its affairs.

### III.

■ Wood contends that the district court erred in denying his motion for discovery and an evidentiary hearing with respect to two issues relating to the Institute's claim of sovereign immunity: the sources of Institute funding and the precise extent of government control over Institute operations. Denying Wood's motion, the district court explained that sovereign immunity turns "primarily" on legal rather than factual conclusions. *Wood*, No. 98–1952, slip op. at 22. In the context of foreign sovereign immunity

claims, we have recognized that district courts must afford plaintiffs " 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.' " *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir.2000) (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C.Cir.1984)). "In order to avoid burdening a sovereign that proves to be immune from suit, however, ... [such] discovery should be carefully controlled and limited." *Id.* The same principles apply here.

Reviewing for abuse of discretion, *see Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C.Cir.1994), we find no fault with the denial of discovery on the issue of control. The district court had no need to resolve disputed factual issues, relying (as have we) on the Act, bylaws, and Articles of Incorporation, which themselves ensure virtually total executive branch control. Thus, even if, as Wood sought to demonstrate through discovery, the Institute exercises "day-to-day control over [its own] business and financial affairs," Appellant's Br. at 29, the Institute would remain part of the United States government.

The district court did make several factual findings regarding Institute funding, including some findings based on assertions in the Government's brief. Statements by counsel, of course, are not evidence. *See, e.g., Brown v. INS*, 775 F.2d 383, 388 (D.C.Cir.1985). As Wood conceded at oral argument, however, in order to resolve this appeal we need not rely on district court findings concerning disputed details of the Institute's finances. As we have explained, undisputed evidence regarding the nature of Institute funding, together with the Institute's exclusive foreign relations role and the government's extensive control over it, leave no doubt

that the Institute enjoys sovereign immunity.

The decision of the district court is affirmed.

*So ordered.*