# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 5, 2009        Decided April 7, 2009

No. 08-5078

ROGER C.S. LIN, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01825)

*Charles H. Camp* argued the cause for appellants. With him on the briefs was *Peter C. Hansen*.

*Melissa N. Patterson*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Gregory G. Katsas*, Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Mark B. Stern*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: America and China's tumultuous relationship over the past sixty years has trapped the inhabitants of Taiwan in political purgatory. During this time the people on Taiwan have lived without any uniformly recognized government. In practical terms, this means they have uncertain status in the world community which infects the population's day-to-day lives. This pervasive ambiguity has driven Appellants to try to concretely define their national identity and personal rights.

Initially, the individual Appellants sought modest relief: they wanted passports. More specifically, they wanted internationally recognized passports. Now, however, Appellants seek much more. They want to be U.S. nationals with all related rights and privileges, including U.S. passports. Determining Appellants' nationality would require us to trespass into a controversial area of U.S. foreign policy in order to resolve a question the Executive Branch intentionally left unanswered for over sixty years: who exercises sovereignty over Taiwan. This we cannot do. Because the political question doctrine bars consideration of Appellants' claims, the district court had no choice but to dismiss Appellants' complaint for lack of subject matter jurisdiction. Accordingly, we affirm.

I

At the end of the Sino-Japanese War, in 1895, China relinquished the island of Taiwan (then Formosa) to Japan. Treaty of Shimonoseki, China-Japan, art. 2(b), April 17, 1895, 181 Consol. TS 217. After its defeat in World War II, Japan surrendered sovereignty over Taiwan to the Allied forces in 1945. *See* 91 CONG. REC. S8348–49 (1945) (Text of Japanese Order). Specifically, General Douglas MacArthur ordered the

Japanese commanders within China and Taiwan to surrender to Generalissimo Chiang Kai-shek, *id.*, leader of the Chinese Nationalist Party, *The Chinese Revolution of 1949*, http://www.state.gov/r/pa/ho/time/ cwr/88312.htm (last visited March 4, 2009). In 1949, China's civil war—a battle between Chinese nationalists and communists—ended; mainland China fell to the communists and became the People's Republic of China ("P.R.C."), forcing Chiang Kai-shek to flee to Taiwan and re-establish the Republic of China ("R.O.C.") in exile. *Id.*

On September 8, 1951, Japan signed the San Francisco Peace Treaty ("SFPT") and officially renounced "all right, title and claim to Formosa and the Pescadores." Treaty of Peace with Japan, art. 2(b), Sept. 8, 1951, 3 U.S.T. 3169, 136 U.N.T.S. 45. The SFPT does not declare which government exercises sovereignty over Taiwan. It does generally identify the United States as "the principal occupying Power," but does not indicate over what. *Id.* at art. 23(a).

In 1954, the United States recognized the R.O.C. as the government of China, acknowledged its control over Taiwan, and promised support in the event of a large-scale conflict with the P.R.C. Mutual Defense Treaty Between the United States of America and the Republic of China, U.S.-R.O.C., Dec. 2, 1954, 6 U.S.T. 433; *The Taiwan Strait Crises: 1954–55 and 1958*, http://www.state.gov/r/pa/ho/time/lw/88751.htm (last visited March 4, 2009). The ensuing decades, however, brought improved diplomatic relations with the P.R.C. and the United States' posture on Taiwan's sovereign changed. Starting in 1972, the United States recognized that the P.R.C. considered Taiwan a part of China and specifically declined to challenge that position. *See* DEP'T ST. BULL., Mar. 20, 1972, at 435, 437–38 (setting forth the text of Joint Communiqué by U.S. and P.R.C., the "Shanghai Communiqué," issued on February 27, 1972). In 1979, President Carter recognized the P.R.C. as the

sole government of China and simultaneously withdrew recognition from the R.O.C. *See* DEP'T ST. BULL., January 1, 1979 (setting forth the text of Joint Communiqué on the Establishment of Diplomatic Relations Between the U.S. and P.R.C., issued on December 15, 1978); *see also Goldwater v. Carter*, 617 F.2d 697, 700 (D.C. Cir.), *vacated*, 444 U.S. 996 (1979).

This change in policy prompted Congress to pass the Taiwan Relations Act of 1979 ("TRA"), 22 U.S.C. § 3301 *et seq.*, in order to spell out the United States' new, unofficial relationship with "the people on Taiwan." *See id.* § 3301 ("[T]he Congress finds that the enactment of this Act is necessary to help maintain peace, security, and stability in the Western Pacific; and . . . authoriz[e] the continuation of commercial, cultural, and other relations between the people of the United States and the people on Taiwan."). The TRA established the American Institute in Taiwan ("AIT") as the unofficial U.S. representative for relations with Taiwan. *Id.* § 3305. The AIT, *inter alia*, "processes visa applications from foreign nationals and provides travel-related services for Americans." *United States ex rel. Wood v. Am. Inst. in Taiwan*, 286 F.3d 526, 529 (D.C. Cir. 2002). There is no indication the Congress or the Executive gave the AIT any responsibility for processing passport applications for the people on Taiwan.

The TRA also outlined the United States' "expectation that the future of Taiwan will be determined by peaceful means" and its intention "to provide Taiwan with arms of a defensive character." *Id.* § 3301(b); *see also id.* § 3302 (describing the provision of defense articles and services to Taiwan). Despite the executive renunciation of ties with the R.O.C., Congress pledged to maintain relations with the people on Taiwan and supply the government with weapons. *Id.* Thus began decades of "strategic ambiguity" with respect to sovereignty over

Taiwan. CRS Issue Brief IB98034, *Taiwan: Recent Developments and U.S. Policy Choices*, by Kerry B. Dumbaugh, Foreign Affairs, Defense, and Trade Division, January 24, 2006.

In 2006, Appellants, residents of Taiwan and members of the Taiwan Nation Party, attempted multiple times to submit applications for U.S. passports to the AIT for processing. The AIT refused to accept the applications and, ultimately, prevented Appellants from delivering further submissions. Appellants filed a complaint in the district court seeking essentially two declarations: (1) the AIT's refusal to process the individual Appellants' passport applications wrongfully deprived them of their status as U.S. nationals and attendant rights; and (2) Appellants are U.S. nationals entitled to all associated rights, particularly those flowing from the First, Fifth, Eighth, and Fourteenth Amendments. Am. Compl. 18–19. The district court dismissed the case for lack of subject matter jurisdiction under the political question doctrine. On appeal, Appellants admit Taiwan does not currently have a recognized sovereign, but argue that until it does, the SFPT established the United States as Taiwan's "principal occupying power," effectively giving the United States temporary *de jure* sovereignty. According to Appellants, no subsequent treaty or law abrogates this aspect of the SFPT. When permanent sovereignty is ultimately decided, they concede the United States' supposed *de jure* sovereignty will cease; but, in the meantime, Appellants consider themselves non-citizen U.S. nationals.

## II

We review the district court's dismissal of Appellants' claims *de novo*. *Piersall v. Winter*, 435 F.3d 319, 321 (D.C. Cir. 2006). Under the political question doctrine, a court must decline jurisdiction if there exists "a textually demonstrable constitutional commitment of the issue to a coordinate political

department." *Baker v. Carr*, 369 U.S. 186, 217 (1962). "[D]ecision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Because deciding sovereignty is a political task, Appellants' case is nonjusticiable. *Jones v. United States*, 137 U.S. 202, 212 (1890) ("Who is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political[] question . . . ."); *Baker*, 369 U.S. at 212 ("[R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing . . . .").

Appellants argue this is a straightforward question of treaty and statutory interpretation and well within the Article III powers of the court. It is and it isn't. The political question doctrine deprives federal courts of jurisdiction, based on prudential concerns, over cases which would normally fall within their purview. *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). We do not disagree with Appellants' assertion that we *could* resolve this case through treaty analysis and statutory construction, *see Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[T]he courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."); we merely decline to do so as this case presents a political question which strips us of jurisdiction to undertake that otherwise familiar task. *See Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006) ("We need not quarrel with the plaintiffs' assertion that certain claims for torture may be adjudicated in the federal courts as provided in the TVPA. We simply observe that such a claim, like any other, may not be heard if it presents a political question.").

Once the Executive determines Taiwan's sovereign, we can decide Appellants' resulting status and concomitant rights expeditiously. *Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area."). But for many years—indeed, as Appellants admit, since the signing of the SFPT itself—the Executive has gone out of its way to avoid making that determination, creating an information deficit for determining the status of the people on Taiwan. Appellants insist they do not ask the court to determine Taiwan's sovereign; however, without knowing Appellants' status, we cannot delineate Appellants' resultant rights.

Identifying Taiwan's sovereign is an antecedent question to Appellants' claims. This leaves the Court with few options. We could jettison the United States' long-standing foreign policy regarding Taiwan—that of strategic ambiguity—in favor of declaring a sovereign. But that seems imprudent. Since no war powers have been delegated to the judiciary, judicial modesty as well as doctrine cautions us to abjure so provocative a course.

Appellants attempt to side-step this fatal hurdle by asserting that, for the limited purpose of determining their status and rights under U.S. law, the issue of sovereignty is already decided under the SFPT. According to them, as the "principal occupying power" under the treaty, the United States retains temporary *de jure* sovereignty over Taiwan. Consequently, Appellants urge us to remember recognizing that the determination of sovereignty over an area is a political question "does not debar courts from examining the status resulting from prior action." *Vermilya-Brown Co. v. Connell*, 335 U.S. 377,

380 (1948). True enough. However, under the interpretation of the political departments to whom we must defer in such matters, *Pearcy v. Stranahan*, 205 U.S. 257, 265 (1907) (deferring to "the interpretation which the political departments have put upon [a] treaty" when resolving a question of sovereignty), it remains unknown whether, by failing to designate a sovereign but listing the United States as the "principal occupying power," the SFPT created any kind of sovereignty in the first place. Therefore, the "prior action" on which Appellants rely is not only an open question, but is in fact the same question Appellants insist they do not require this Court to answer: who is Taiwan's sovereign? Appellants may even be correct; careful analysis of the SFPT might lead us to conclude the United States has temporary sovereignty. But we will never know, because the political question doctrine forbids us from commencing that analysis. We do not dictate to the Executive what governments serve as the supreme political authorities of foreign lands, *Jones*, 137 U.S. at 212; this rule applies *a fortiori* to determinations of U.S. sovereignty.

Appellants query how the political question doctrine can bar their claims in light of the Supreme Court's recent decision in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008). They observe:

> If the United States Supreme Court can, during open hostilities, consider and rule on issues involving Congress, the Executive Branch and the United States Constitution in respect of the handling of alleged enemy aliens directly threatening the United States mainland, surely the interpretation of the SFPT and its legal effects upon Appellants under U.S. laws are properly within the courts' purview.

Appellants' Br. 28. At first blush, it is difficult to challenge Appellants' reasoning. In truth, one can understand the

9

perception that the Court in *Boumediene* went far beyond its historically limited role with respect to national security and foreign policy. *See Schneider*, 412 F.3d at 195 (Article III "provides no authority for policymaking in the realm of foreign relations or provision of national security. . . . [D]ecision-making in the areas of foreign policy and national security is textually committed to the political branches."). Under precedent both *de jure* and *de facto* sovereignty are political questions—indeed, archetypal political questions. *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918). Still, to read *Boumediene* as Appellants suggest would call into question the continuing viability of the entire political question doctrine. We do not read *Boumediene* so broadly, particularly as the majority merely held it had authority to review enemy detentions under the Suspension Clause in those cases where *de facto* sovereignty is "uncontested." *Boumediene*, 128 S. Ct. at 2247, 2252–53, 2262.

Even if we concluded (which we do not) that *Boumediene* abrogated *sub silentio* the political question doctrine as it relates to *de facto* sovereignty, no valid argument can be made that it did so in relation to determining *de jure* sovereignty, which is at issue here. The majority in *Boumediene* explained, "to hold that the present cases turn on the political question doctrine, we would be required first to accept the Government's premise that *de jure* sovereignty is the touchstone of habeas corpus jurisdiction," and then rejected that premise as "unfounded." *Boumediene*, 128 S. Ct. at 2253. As counsel for the Government aptly put it at oral argument, the gravamen of the Court's decision centered not on the *de jure* reach of the Constitution, but on the limitations that adhere to the United States' actual exercise of power over non-citizens detained in a foreign territory. Appellants do not assert, nor could they, that the United States exercises actual control over the people on

Taiwan.  Thus, to the extent relevant in this case, *Boumediene* left the political question doctrine intact.

Finally, Appellants attempt to analogize the United States' former relationship with the Philippines, after Spain ceded the Philippine Islands to the United States in 1898, to its current relationship with Taiwan.  The comparison is inapposite. Congress, not a court, declared the Filipino population was "entitled to the protection of the United States" based on the United States' sovereignty over the Philippines.  *See Rabang v. Boyd*, 353 U.S. 427, 429 (1957).  Later, Congress acknowledged "the final and complete withdrawal of American sovereignty over the Philippine Islands" and stripped the Filipino people of their non-citizen national status.  *Id.* at 429–30.  Therefore, unlike here, courts confronting claims involving the rights enjoyed by Filipinos had no need to determine sovereignty over the Philippine Islands.

Appellants argue that, as in the Philippines, the people on Taiwan owe the United States "permanent allegiance" and, consequently, meet the definition of U.S. nationals.  *See* 8 U.S.C. § 1101(a)(22) ("The term 'national of the United States' means . . . a person who, though not a citizen of the United States, owes permanent allegiance to the United States.").  We join the majority of our colleagues and conclude manifestations of "permanent allegiance" do not, by themselves, render a person a U.S. national.  *See Marquez-Almanzar v. INS*, 418 F.3d 210, 218–19 (2d Cir. 2005) (holding "one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of  'permanent allegiance' to the United States. . . .  [T]he road to U.S. nationality runs through provisions detailed elsewhere in the Code, see 8 U.S.C. §§ 1401–58, and those provisions indicate that the only 'non-citizen nationals' currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408."); *see also Abou-*

*Haidar v. Gonzales*, 437 F.3d 206, 207 (1st Cir. 2006) ("The overwhelming majority of circuit courts to consider the question have concluded that one can become a 'national' of the United States only by birth or by naturalization under the process set by Congress."); *Sebastian-Soler v. U.S. Att'y Gen.*, 409 F.3d 1280, 1285–87 (11th Cir. 2005); *Salim v. Ashcroft*, 350 F.3d 307, 309–10 (3d Cir. 2003); *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 972 (9th Cir. 2003). Moreover, Congress precisely defined a non-citizen national as, *inter alia*, a person "born in an outlying possession of the United States on or after the date of formal acquisition of such possession." 8 U.S.C. § 1408. The term "outlying possessions of the United States" means American Samoa and Swains Island. *Id.* § 1101(a)(29). The definition does not include Taiwan. *Id.* Thus, attitudes of permanent allegiance do not help Appellants.

## III

Addressing Appellants' claims would require identification of Taiwan's sovereign. The Executive Branch has deliberately remained silent on this issue and we cannot intrude on its decision. Therefore, as the district court correctly concluded, consideration of Appellants' claims is barred by the political question doctrine. Accordingly, we affirm.

*So ordered.*