# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2008        Decided July 10, 2009

No. 07-5347

ARI Z. ZIVOTOFSKY, M.B.Z. BY HIS PARENTS AND GUARDIANS
AND NAOMI SIEGMAN ZIVOTOFSKY, M.B.Z. BY HIS PARENTS
AND GUARDIANS,
APPELLANTS

v.

SECRETARY OF STATE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01921)

———

*Nathan Lewin* argued the cause for appellants. With him on the briefs was *Alyza D. Lewin*.

*Lewis Yelin*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Douglas N. Letter*, Appellate Litigation Counsel. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

GRIFFITH, *Circuit Judge*: It has been the longstanding policy of the United States to take no side in the contentious debate over whether Jerusalem is part of Israel. In this case, the federal courts are asked to direct the Secretary of State to contravene that policy and record in official documents that Israel is the birthplace of a U.S. citizen born in Jerusalem. Because the judiciary has no authority to order the Executive Branch to change the nation's foreign policy in this matter, this case is nonjusticiable under the political question doctrine.

## I.

That the United States expresses no official view on the thorny issue of whether Jerusalem is part of Israel has been a central and calibrated feature of every president's foreign policy since Harry S. Truman. *See* Br. for Appellee at 6; J.A. at 57 (Defendant's Responses to Plaintiff's Interrogatories). State Department policy governing how to describe the status of Jerusalem in passports and Consular Reports of Birth[1] of U.S. citizens born there implements the presidential decision

---

[1] A Consular Report of Birth is an official record of U.S. citizenship for a person born abroad. *See* Application for a Consular Report of Birth, http://www.state.gov/documents/organization/83127.pdf ("A Consular Report of Birth may be issued for any U.S. citizen child under age 18 who was born abroad and who acquired U.S. citizenship at birth.").

to remain neutral. Although the State Department typically records a passport holder's birthplace as the nation with sovereignty over his city of birth, *see* 7 U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL § 1383.1, passports issued to U.S. citizens born in Jerusalem note only the city, *see id.* § 1360, app. D ("For a person born in Jerusalem, write JERUSALEM as the place of birth in the passport. Do not write Israel . . . ."). The State Department follows the same policy for Consular Reports of Birth. *See* Br. for Appellee at 9.

In 2002, Congress passed the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 2651 note (2006)). Section 214 of the Act, entitled "United States Policy with Respect to Jerusalem as the Capital of Israel," challenges the Executive's position on the status of Jerusalem. *Id.* § 214, 116 Stat. at 1365. Subsection 214(a), for example, "urges the President . . . to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem." *Id.* § 214(a), 116 Stat. at 1365. Under subsection 214(c), Congress forbids the Executive from using appropriated funds for "publication of any official governmental document which lists countries and their capital cities unless the publication identifies Jerusalem as the capital of Israel." *Id.* § 214(c), 116 Stat. at 1366. And subsection 214(d), the provision at issue in this case, states:

> Record of Place of Birth as Israel for Passport Purposes.—For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel.

*Id.* § 214(d), 116 Stat. at 1366. In a written statement issued when he signed the bill into law, the President took the view that section 214 is merely advisory because a congressional command to the Executive to change the government's position on the status of Jerusalem would "impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states." President George W. Bush, Statement on Signing the Foreign Relations Authorization Act, 38 WEEKLY COMP. PRES. DOC. 1659 (Sept. 30, 2002). Even in signing the Act, the President made clear that "U.S. policy regarding Jerusalem has not changed." *Id.*

Enactment of the law provoked confusion and criticism overseas. The U.S. Consulate in Jerusalem informed the State Department that "[d]espite [its] best efforts to get the word out that U.S. policy on Jerusalem has not changed, the reservations contained in the President's signing statement have been all but ignored, as Palestinians focus on what they consider the negative precedent and symbolism of an American law declaring that Israel's capital is Jerusalem." J.A. at 398 (October 2002 declassified cable from the U.S. Consulate in Jerusalem to the Secretary of State); *see also id.* at 396–97 (October 2002 declassified cable from the State Department to U.S. missions abroad).

In October 2002, Menachem Zivotofsky was born in Jerusalem to parents who are U.S. citizens, making him a citizen as well. *See* 8 U.S.C. § 1401(c) (2006). In December 2002, Menachem's mother applied for a U.S. passport and a Consular Report of Birth for her son at the U.S. Embassy in Tel Aviv, Israel. She requested that both documents record her son's place of birth as "Jerusalem, Israel." U.S. diplomatic officials told Mrs. Zivotofsky that State Department policy

forbade them from recording "Israel" as her son's birthplace. Consistent with its policy, the State Department issued a passport and Consular Report of Birth identifying "Jerusalem" as Menachem's place of birth without reference to Israel.

In September 2003, Menachem (by his parents) filed this action for declaratory and injunctive relief ordering the State Department to comply with the directive in section 214(d) and record "Jerusalem, Israel," as his birthplace in both his passport and Consular Report of Birth. The district court ruled that Menachem lacked standing to complain about the contents of the documents because he could use them regardless of how they described his birthplace. Invoking the political question doctrine, the court also concluded that it was without jurisdiction to consider his claim because there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Zivotofsky v. Sec'y of State*, No. 03-1921, slip op. at 9 (D.D.C. Sept. 7, 2004) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). In the district court's view, the "desired passport wording . . . would confer recognition in an official, diplomatic document that Israel has sovereignty over Jerusalem." *Id.* at 10. Such a result, the court held, would unlawfully trench upon the Executive's exclusive power to recognize foreign governments. *Id.*

We reversed the district court's decision on standing, concluding that the relevant issue is not whether Zivotofsky can use his passport. He has standing because "Congress conferred on him an individual right to have 'Israel' listed as his place of birth on his passport and on his Consular Birth Report," and "the Secretary of State violated that individual right." *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 619 (D.C. Cir. 2006). We also remanded the case for the district court to

determine whether section 214(d) is mandatory or advisory, develop a more complete record, and consider the implications, if any, of Zivotofsky's request, first made in his motion for summary judgment, that his passport and Consular Report of Birth record "Israel" as his place of birth, instead of noting "Jerusalem, Israel," as he pleaded in the complaint. *Id.* at 619–20. On remand, the district court granted the Secretary's motion to dismiss for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1), holding again that because the complaint asserts a claim that implicates the President's recognition power, it "raises a quintessential political question which is not justiciable by the courts." *Zivotofsky v. Sec'y of State*, 511 F. Supp. 2d 97, 102 (D.D.C. 2007).

Zivotofsky appeals the district court's dismissal of his case, which we review de novo. *See Piersall v. Winter*, 435 F.3d 319, 321 (D.C. Cir. 2006). We have jurisdiction to consider the appeal under 28 U.S.C. § 1291 (2006). The threshold question before us is whether the courts have jurisdiction to provide Zivotofsky the relief he seeks or whether he must pursue his remedies from the political branches. *See Lin v. United States*, 561 F.3d 502, 504 (D.C. Cir. 2009).

## II.

In *Baker v. Carr*, the Supreme Court held that courts may not consider claims that raise issues whose resolution has been committed to the political branches by the text of the Constitution. 369 U.S. at 217; *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (stating that the judiciary may not review "policy choices and value determinations constitutionally committed" to Congress or the Executive). Following the framework laid out in *Nixon v.*

*United States*, we begin by "interpret[ing] the [constitutional] text in question and determin[ing] whether and to what extent the issue is textually committed" to a political branch. 506 U.S. 224, 228 (1993); *see also Clinton v. Jones*, 520 U.S. 681, 700 n.34 (1997); *Powell v. McCormack*, 395 U.S. 486, 519 (1969). But to perform the analysis prescribed by *Nixon*, we must first determine "the issue" before us. Only then can we decide whether that issue has been committed by the Constitution solely to the political branches or whether it is a proper matter for the judiciary to resolve. *See Nixon*, 506 U.S. at 228. Relying on section 214(d) of the Foreign Relations Authorization Act, Zivotofsky asked the district court to "order[] the [Secretary of State] to issue a passport to [him] specifying [his] place of birth as [Israel]" and to instruct the Executive "to comply with Section 214(d)." Compl. ¶ 9. Given Zivotofsky's claim, the issue before us is whether the State Department can lawfully refuse to record his place of birth as "Israel" in the face of a statute that directs it to do so. *See id.* The issue is not, as the concurrence asserts, "[w]hether § 214(d) . . . is a constitutionally valid enactment," Concurring Op. at 3. This critical difference sets us on different paths at the very outset.

It is well established that the Constitution's grant of authority to the President to "receive Ambassadors and other public Ministers," U.S. CONST. art. II, § 3, includes the power to recognize foreign governments. *See, e.g.*, LOUIS HENKIN, FOREIGN AFFAIRS AND THE UNITED STATES CONSTITUTION 38 (2d ed. 1996) (explaining that the ambassadorial receipt clause in Article II "implies [the] power to recognize (or not to recognize) governments"). That this power belongs solely to the President has been clear from the earliest days of the Republic. *See* Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111 YALE L.J. 231, 312–13 (2001) ("Congress never dictated [to President

George Washington] which countries or governments to recognize because it understood that the Constitution had shifted the recognition power from Congress to the President."). The Supreme Court has recognized this constitutional commitment of authority to the President repeatedly and consistently over many years. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition [of a foreign sovereign] is exclusively a function of the Executive."); *Goldwater v. Carter*, 444 U.S. 996, 1007 (1979) (Brennan, J., dissenting) ("Our cases firmly establish that the Constitution commits to the President alone the power to recognize, and withdraw recognition from, foreign regimes." (citing *Sabbatino*, 376 U.S. at 410; *Baker*, 369 U.S. at 212; *United States v. Pink*, 315 U.S. 203, 228–30 (1942))).

The President's exercise of the recognition power granted solely to him by the Constitution cannot be reviewed by the courts. *See, e.g.*, *Nat'l City Bank v. Republic of China*, 348 U.S. 356, 358 (1955) ("The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court."). A decision made by the President regarding which government is sovereign over a particular place is an exercise of that power. As the Supreme Court explained nearly two hundred years ago, "when the executive branch . . . assume[s] a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department." *Williams v. Suffolk Ins. Co.*, 38 U.S. 415, 418 (1839) (refusing to question the President's decision regarding which country exercised sovereignty over the Falkland Islands); *see also Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory . . . ."). As a result, we have declined invitations to question the President's use of the recognition power. *See Lin*, 561 F.3d at 508 (refusing to deem

residents of Taiwan U.S. nationals and to declare that they are entitled to U.S. passports because courts may not intrude on the Executive's decision to remain silent about Taiwan's sovereignty).

Thus the President has exclusive and unreviewable constitutional power to keep the United States out of the debate over the status of Jerusalem. Nevertheless, Zivotofsky asks us to review a policy of the State Department implementing the President's decision. But as the Supreme Court has explained, policy decisions made pursuant to the President's recognition power are nonjusticiable political questions. *See Pink*, 315 U.S. at 229 ("Objections to the underlying policy as well as objections to recognition are to be addressed to the political department and not to the courts."). And every president since 1948 has, as a matter of official policy, purposefully avoided taking a position on the issue whether Israel's sovereignty extends to the city of Jerusalem. *See* Br. for Appellee at 6; J.A. at 57 (Defendant's Responses to Plaintiff's Interrogatories). The State Department's refusal to record "Israel" in passports and Consular Reports of Birth of U.S. citizens born in Jerusalem implements this longstanding policy of the Executive. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (recognizing that a U.S. passport is an official government document used to communicate with foreign governments). By asking the judiciary to order the State Department to mark official government documents in a manner that would directly contravene the President's policy, Zivotofsky invites the courts to call into question the President's exercise of the recognition power. This we cannot do. We therefore hold that Zivotofsky's claim presents a nonjusticiable political question because it trenches upon the President's constitutionally committed recognition power.

Zivotofsky argues that the political question doctrine cannot foreclose a court from enforcing a duly enacted law. In his view, this court is asked to do nothing more than interpret a federal statute—a task within our power and competency. To grant the requested relief would not require that we determine the status of Jerusalem, he argues, because enactment of section 214(d) has decided that question. Enforcement of the rights Congress created presents no political question. The government responds that even if we find jurisdiction to consider Zivotofsky's claim, we must nevertheless strike section 214(d) as an unconstitutional infringement on the President's recognition power. We agree that resolving Zivotofsky's claim either at the jurisdictional stage under the political question doctrine or on the merits by striking section 214(d) implicates the recognition power. Only the Executive—not Congress and not the courts—has the power to define U.S. policy regarding Israel's sovereignty over Jerusalem and decide how best to implement that policy. The question for us is whether Zivotofsky loses on jurisdictional grounds, or on the merits because Congress lacks the power to give him an enforceable right to have "Israel" noted as his birthplace on his government documents.[2]

Under the Supreme Court's precedent and our own, the answer must be the former. We are aware of no court that has held we cannot or need not conduct the jurisdictional analysis

---

[2] The hypothetical lawsuit posed by the concurrence presents a very different issue than the one we face regarding the Executive's decision to recognize (or not to recognize) which country exercises sovereignty over a disputed area. *See* Concurring Op. at 12. We do not hold, as the concurrence seems to assume, that *any* claim quarreling with a State Department passport policy would necessarily implicate the Recognition Power and therefore raise a political question.

called for by the political question doctrine simply because the claim asserted involves a statutory right. We must always begin by interpreting the constitutional text in question and determining "whether and to what extent the issue is textually committed." *Nixon*, 506 U.S. at 228. The question is not whether the courts are competent to interpret a statute. Certainly we are. But as our recent decision makes clear, we will decline to "resolve [a] case through . . . statutory construction" when it "presents a political question which strips us of jurisdiction to undertake that otherwise familiar task." *Lin*, 561 F.3d at 506. In a case such as this, to borrow the words of Professor Wechsler, "abstention of decision" is required because deciding whether the Secretary of State must mark a passport and Consular Report of Birth as Zivotofsky requests would necessarily draw us into an area of decisionmaking the Constitution leaves to the Executive alone. *See* HERBERT WECHSLER, PRINCIPLES, POLITICS AND FUNDAMENTAL LAW 11–14 (1961). That Congress took a position on the status of Jerusalem and gave Zivotofsky a statutory cause of action in an effort to make good on its pronouncement is of no moment to whether the judiciary has authority to resolve this dispute between the political branches. We have never relied on the presence or absence of a statutory challenge in deciding whether the political question doctrine applies. *See Lin*, 561 F.3d at 506; *S. African Airways v. Dole*, 817 F.2d 119, 123 (D.C. Cir. 1987) (noting that although the court had "competence to interpret the meaning of section 306(a)(2) of the Anti-Apartheid Act," it first had to "consider . . . whether in doing so [it] would trespass on territory reserved to the political branches"); *Population Inst. v. McPherson*, 797 F.2d 1062, 1070 (D.C. Cir. 1986) (determining first whether there was a "constitutional commitment of [the] issue to a coordinate branch," which would prevent the court from considering a challenge to an agency's interpretation of the Foreign

12

Assistance and Related Programs Appropriations Act of 1985). We decline to be the first court to hold that a statutory challenge to executive action trumps the analysis in *Baker* and *Nixon* and renders the political question doctrine inapplicable.

## III.

Because we conclude that Zivotofsky's complaint raises a nonjusticiable political question, we affirm the district court's dismissal of his suit for lack of subject matter jurisdiction.[3] Lacking authority to consider the case, we do not address the merits of the parties' other arguments. The judgment of the district court is

*Affirmed.*

---

[3] Our concurring colleague raises an interesting point about the distinction between questions we do not have jurisdiction to consider and those that are nonjusticiable. *See* Concurring Op. at 5–7. Although *Baker* makes that distinction, *see* 369 U.S. at 198, the Court's other cases suggest that claims raising political questions fall into both categories. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 941 (1983). We have consistently dismissed claims raising political questions for want of subject matter jurisdiction once we have found nonjusticiability. *See Lin*, 561 F.3d at 504; *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary is as old as the fundamental principle of judicial review." (internal quotation marks omitted)). We do not grapple with this dispute, if one indeed exists, because it makes no practical difference in the outcome of the case. Either way, we lack authority to consider Zivotofsky's claim.

EDWARDS, *Senior Circuit Judge, concurring*: In 2002, Congress passed the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, 116 Stat. 1350 (2002) ("Foreign Relations Authorizations Act" or "Act"). The Act was signed into law on September 20, 2002 by President George W. Bush. Section 214 of the Act, entitled "United States Policy with Respect to Jerusalem as the Capital of Israel," includes the following provision which is at issue in this case:

> (d) RECORD OF PLACE OF BIRTH AS ISRAEL FOR PASSPORT PURPOSES – For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel.

*Id*. § 214(d).

When the Foreign Relations Authorizations Act was signed into law, the President attached a "signing statement," objecting to portions of § 214. The statement asserted that "Section 214, concerning Jerusalem, impermissibly interferes with the President's constitutional authority to . . . determine the terms on which recognition is given to foreign states. U.S. policy regarding Jerusalem has not changed." President George W. Bush, *Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003*, 2 PUB. PAPERS 1698 (Sept. 30, 2002).

Menachem Binyamin Zivotofsky was born in 2002 in Jerusalem. Because his parents are United States citizens, Zivotofsky is also a United States citizen. *See* 8 U.S.C. § 1401(c) (2006). After Zivotofsky's birth, his mother filed an application on his behalf for a consular report of birth abroad and a United States passport. She requested of United States officials that these documents indicate her son's place of birth as "Jerusalem, Israel." United States diplomatic officials informed Mrs. Zivotofsky that passports issued to United States citizens born in Jerusalem could not record "Israel" as the place

of birth. When the Zivotofskys received Menachem's passport and consular report, both documents recorded his place of birth as "Jerusalem." On his behalf, Zivotofsky's parents filed this action under § 214(d) against the Secretary of State seeking to compel the State Department to identify Menachem's place of birth as "Israel."

In defending against Zivotofsky's action in this case, the Secretary has pressed two principal arguments:

> [1] Zivotofsky has no judicially enforceable right because his complaint presents a political question. The power to recognize foreign sovereigns – including the power to recognize claims over disputed foreign territory – is textually committed by the Constitution to the President, and is therefore not subject to judicial override.

> [2] Section 214(d) is unconstitutional. Article II assigns to the President the exclusive power to recognize foreign sovereigns, and Congress has no authority to override or intrude on that power.

Appellee's Br. at 18, 21. The Secretary's first argument – that Zivotofsky's claim is a nonjusticiable political question – is specious. The Secretary's second argument, contesting the constitutionality of § 214(d), stands on solid footing.

## I. THE POLITICAL QUESTION DOCTRINE HAS NO APPLICATION IN THIS CASE

### A. The Issue Before the Court

The Secretary does not doubt that Zivotofsky has standing to raise a viable cause of action under § 214(d) of the Foreign Relations Authorizations Act. Nor does the Secretary doubt that Zivotofsky properly invoked the District Court's statutory jurisdiction under 28 U.S.C. §§ 1331, 1346(a) (2), and 1361. Therefore, the issue before this court is:

> Whether § 214(d) of the Foreign Relations Authorizations Act, which affords Zivotofsky a statutory right to have "Israel" listed as the place of birth on his passport, is a constitutionally valid enactment.

Put another way, the court must decide:

> Whether, in enacting § 214(d), a provision purporting to address "United States Policy with Respect to Jerusalem as the Capital of Israel," Congress impermissibly intruded on the President's exclusive power to recognize foreign sovereigns.

These questions involve commonplace issues of statutory and constitutional interpretation, and they are plainly matters for the court to decide. And in answering these questions, this court has no occasion to address a "political question" that is reserved to the exclusive authority of one of the political branches of government.

### B. First Principles Governing the Jurisdiction of Federal Courts

In considering whether a matter should be dismissed as a nonjusticiable political question, it is important to recall the first principles that govern the jurisdiction of federal courts:

- "It is, emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

- "[F]ederal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989); *see also Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008).

- "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

In sum, "[w]hen a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." *Willcox v. Consol. Gas Co. of New York*, 212 U.S. 19, 40 (1909).

## C. Nonjusticiable "Political Questions"

The political question doctrine embraces a limited exception to the rule that "federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *New Orleans Pub. Serv.*, 491 U.S. at 358. As the Supreme Court explained in *Baker v. Carr*, 369 U.S. 186 (1962), "[w]here the Constitution assigns a particular function wholly and indivisibly to another department, the federal judiciary does not intervene." *Id*. at 246 (Douglas, J., concurring). The converse of this proposition is that a federal court must not abstain from the exercise of jurisdiction that has been conferred, unless it has been asked to conclusively resolve a question that is "wholly and indivisibly" committed by the Constitution to a political

branch of government. "Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *New Orleans Pub. Serv.*, 491 U.S. at 359.

The Supreme Court has described the political question doctrine as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also INS v. Chadha*, 462 U.S. 919, 941 (1983); *United States v. Munoz-Flores*, 495 U.S. 385, 389-90 (1990). As explained below, this case in no way fits within the frame of the *Baker v. Carr* "political question" paradigm.

### D. The Crucial Distinction Between Jurisdiction and Nonjusticiability

In explaining the political question doctrine, the Court in *Baker v. Carr* was careful to amplify a crucial distinction between "cases withholding federal judicial relief [1] rest[ing] upon a lack of federal jurisdiction [and] [2] upon the inappropriateness of the subject matter for judicial consideration – what [the Court has] designated 'nonjusticiability.'" 369 U.S. at 198.

The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

*Id.*

When a federal court dismisses a case because it presents a "political question," it does so not because the court lacks subject matter jurisdiction but, rather, because the "duty asserted can[not] be judicially identified and its breach judicially determined." *Id*. "[T]he mere fact that [a] suit seeks protection of a political right does not mean it presents a political question." *Id*. at 209. And "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id*. at 211; *see also Simon v. Republic of Iraq*, 529 F.3d 1187, 1197 (D.C. Cir. 2008) (the political question doctrine cannot be invoked to dismiss an action merely because it "may affect the foreign relations of the United States"). As noted scholars have pointed out, "[i]nterpretation of statutes affecting foreign affairs is not likely to be barred by [the] political-question doctrine." 13C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3534.2 (3d ed. 2008), cases cited in n.35.

The political question doctrine is purposely very narrow in scope, lest the courts use it as a vehicle "to decline the exercise

of jurisdiction which is given." *Cohens*, 19 U.S. (6 Wheat.) at 404. As the Court noted in *Baker*,

> [t]he doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "'political'" exceeds constitutional authority.

369 U.S. at 217. Unsurprisingly, federal cases in which subject matter jurisdiction and standing are properly asserted are rarely dismissed as nonjusticiable pursuant to the political question doctrine. Indeed, since *Baker*, the Supreme Court has only dismissed two cases as presenting nonjusticiable political questions. *See Gilligan v. Morgan*, 413 U.S. 1, 5 (1973) (declining "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" on the basis of an explicit constitutional textual commitment of that power to Congress and President); *Nixon v. United States*, 506 U.S. 224 (1993) (finding request to review Senate impeachment proceedings nonjusticiable in light of explicit textual constitutional commitment of impeachment power to Senate).

The Supreme Court often hears and decides cases bearing major foreign policy implications. *See, e.g.*, *Boumediene*, 128 S. Ct. 2229 (declining to dismiss the case under the political question doctrine and ruling that aliens detained as enemy combatants at United States Naval Station at Guantanamo Bay, Cuba, were entitled to the privilege of habeas corpus to challenge the legality of their detention, even though the United States did not claim sovereignty over place of detention). These cases are not dismissed pursuant to the political question doctrine. The reason is simple: Although the establishment of policies governing foreign relations is the business of the political branches, the determination of the meaning and legality of a congressionally enacted statute is the business of the courts.

**E. The Legal Principles Controlling This Case**

The principles enunciated by *Baker* and its progeny are really quite simple to comprehend and apply in this case. The controlling principles governing this case are these:

- **The federal courts decide matters of statutory construction and constitutional interpretation.** *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."); *Chadha*, 462 U.S. at 943 ("Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications. . . ."); *see also Goldwater v. Carter*, 444 U.S. 996, 1002 (1979) (Powell, J., concurring in the judgment) ("[The Supreme Court has] the responsibility to decide whether both the Executive and Legislative branches have constitutional roles to play in termination of a treaty. If the Congress, by appropriate formal action, had challenged the President's authority to terminate the treaty . . . it would be the duty of this Court to resolve the issue.").

- **When the federal courts review the constitutionality of a challenged statute, they do not infringe the authority of the legislative branch.** In *Munoz-Flores*, 495 U.S. at 390, the Supreme Court tellingly stated:

  > The Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a "lack of respect" for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, *every* judicial

resolution of a constitutional challenge to a congressional enactment would be impermissible.

- **The federal courts may not decide an issue whose resolution is committed by the Constitution to the exclusive authority of a political branch of government.** *See Baker*, 369 U.S. at 217; *Gilligan,* 413 U.S. at 6-7; *Nixon*, 506 U.S. at 229-36. This does not mean that a court may not decide a case that merely implicates a matter within the authority of a political branch. Congress, alone, has the authority to pass legislation, but it does not follow from this that the courts are without authority to assess the constitutionality of a statute that has been properly challenged. Rather, the political question doctrine bars judicial review only when the precise matter to be decided has been constitutionally committed to the exclusive authority of a political branch of government. *Compare Nixon*, 506 U.S. at 229-36, *with Powell v. McCormack*, 395 U.S. 486, 519-22 (1969).

- **The courts may, however, decide whether and to what extent a matter is reserved to the exclusive authority of a political branch.** *Baker*, 369 U.S. at 211 ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."); *Powell*, 395 U.S. at 521 ("[W]hether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department' of government and what is the scope of such commitment are questions we must resolve."); *Nixon*, 506 U.S. at 238 ("[C]ourts possess power to review either legislative or executive action that transgresses identifiable textual limits").

10

- **The courts routinely adjudicate separation-of-powers claims**.  As the Court noted in *Munoz-Flores*, 495 U.S. at 393:

> In many cases involving claimed separation-of-powers violations, the branch whose power has allegedly been appropriated has both the incentive to protect its prerogatives and institutional mechanisms to help it do so.   Nevertheless, the Court adjudicates those separation-of-powers claims, often without suggesting that they might raise political questions.  *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 371-379 (1989) (holding that Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, and 28 U.S.C. § 991 *et seq.*, did not result in Executive's wielding legislative powers, despite either House's power to block Act's passage); *Morrison v. Olson*, 487 U.S. 654, 685-696 (1988) (holding that independent counsel provision of Ethics in Government Act of 1978, 28 U.S.C. § 591 *et seq.*, is not a congressional or judicial usurpation of executive functions, despite President's veto power); *INS v. Chadha*, 462 U.S. 919 (1983) (explicitly finding that separation-of-powers challenge to legislative veto presented no political question).  In short, the fact that one institution of Government has mechanisms available to guard against incursions into its power by other governmental institutions does not require that the Judiciary remove itself from the controversy by labeling the issue a political question.

- **If a federal court finds that a political branch has overreached in its claim of constitutionally committed authority, the court will decide the matter that is properly before it for resolution on the merits.** *Baker*, 369 U.S. at 211 ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution"); *accord Powell*, 395 U.S. at 521.

- **If a federal court determines that a political branch has acted within the compass of exclusive authority granted to it by the Constitution, the court may determine whether the other branch has acted to infringe that authority. The court does not review the substantive decision reached by the branch with exclusive authority; it merely determines whether the exercise of that authority has been infringed by the other branch.** *Baker*, 369 U.S. at 212 ("[O]nce sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area."); *Vermilya-Brown Co., Inc. v. Connell*, 335 U.S. 377, 380-81 (1948) (holding question whether Fair Labor Standards Act covered employees allegedly engaged in the production of goods for commerce on a leasehold of the United States was not a political question; in reaching this conclusion, the Court made clear it was not second-guessing the Executive's determination regarding the sovereignty of Great Britain over the foreign territory).

### F.   The Zivotofsky Claim is Plainly Justiciable

In light of the legal principles that control this case, the Secretary's attempt to invoke the political question doctrine is meritless.  The following example amplifies the point:

Assume that a lawfully enacted congressional statute provides that individuals over the age of 18 have a right to secure a passport on their own.  Assume further that the statute gives individuals an enforceable right of action.  If the Secretary of State adopts a policy pursuant to which 18-year-olds are denied passports without parental consent, claiming an exercise of the Executive's recognition power, an aggrieved party would have a right of action to challenge the Secretary.  A federal court hearing the case would be without authority to dismiss the action as a nonjusticiable political question.  Why?  Because the plaintiff has standing to pursue her claim and the court has jurisdiction to hear it.  And the court would be well able to evaluate the competing claims of power and easily determine that the Executive overreached in its claim to exclusive authority under the recognition power.  The court would find no valid exercise of textually committed power by the executive branch. *See Powell*, 395 U.S. 486.

The flip side of this example is seen in a case like *Nixon*, 506 U.S. 224.  In *Nixon*, the petitioner asked the Court to decide whether Senate Rule XI, which allowed "a committee of Senators to hear evidence against an individual who has been impeached and to report that evidence to the full Senate," violated the Constitution's Impeachment Trial Clause, Art. I, § 3, cl. 6.  506 U.S. at 226.  The Trial Clause provides that the "Senate shall have the *sole* Power to try all Impeachments." *Id.* (emphasis added).  The Court first found that this provision reflects a clear "grant of authority to the Senate, and the word 'sole' indicates that this authority is reposed in the Senate and nowhere else." *Id.* at 229.  Having found a textually demonstrable constitutional commitment of the impeachment

issue to a coordinate political department, the Court held that the action involved a nonjusticiable political question. Zivotofsky's claim, which is founded on a cause of action under § 214(d), is nothing like Nixon's claim.

In this case, there are two questions that are properly before the court: (1) whether the Executive's passport policy reflects an action taken within the President's exclusive power to recognize foreign sovereigns; and (2) if so, whether Congress' enactment of § 214(d) impermissibly intruded on the President's exclusive power to recognize foreign sovereigns. These questions raise issues that are constitutionally committed to the judicial branch to decide. Zivotofsky's claim resting on § 214(d) does not require this court to evaluate the wisdom of the Executive's foreign affairs decisions or to determine the political status of Jerusalem. The court's role in this case is to determine the constitutionality of a congressional enactment. And this role is well within the constitutional authority of the judiciary. *Japan Whaling Ass'n*, 478 U.S. at 230 ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.").

## II. SECTION 214(D) UNCONSTITUTIONALLY INFRINGES THE EXECUTIVE'S EXCLUSIVE AUTHORITY UNDER THE RECOGNITION POWER

Zivotofsky has asked the court to direct the State Department to designate "Israel" as his place of birth on his passport pursuant to Congress' directive in § 214(d). The Executive asserts that § 214(d), if construed to be mandatory, represents an unconstitutional infringement of the President's recognition power as it concerns Jerusalem.

### A. The Recognition Power

The Executive has exclusive and unreviewable authority to recognize foreign sovereigns. This power derives from Article II, § 3 of the Constitution, which gives the President the sole power to "receive Ambassadors and other public Ministers" from foreign countries. U.S. CONST. Art. II, § 3. The power to receive ambassadors includes the power to recognize governments with whom the United States will establish diplomatic relationships. This recognition power is vested solely in the President. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."); *Baker*, 369 U.S. at 212 ("[R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing. . . .'").

It is also clear that, under the recognition power, the President has the sole authority to make determinations regarding the sovereignty of disputed territories. *See Williams v. Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420 (1839) (stating that when the executive branch "assume[s] a fact in regard to the sovereignty of any island or country . . . it is conclusive on the judicial department"); *Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has

sovereignty over disputed territory. . . .”).  Finally, and importantly, the recognition power is “not limited to a determination of the government to be recognized.  It includes the power to determine the policy which is to govern the question of recognition.”  *United States v. Pink*, 315 U.S. 203, 229 (1942).

## B.  The President’s Passport Policy Regarding the Designation of Jerusalem Is an Exercise of the Recognition Power

The Executive and Congress historically have shared authority over the regulation of passports.  However, “[f]rom the outset, Congress [has] endorsed not only the underlying premise of Executive authority in the areas of foreign policy and national security, but also its specific application to the subject of passports.  Early Congresses enacted statutes expressly recognizing the Executive authority with respect to passports.”  *Haig v. Agee*, 453 U.S. 280, 294 (1981); *see also id*. at 292-300 (discussing history of congressional legislation and Executive control over passports); *Kent v. Dulles*, 357 U.S. 116, 122-24 (1958) (same).  Congress passed the first Passport Act in 1856, endorsing the Executive’s power to control passports, *Kent*, 357 U.S. at 123.  The current Passport Act maintains this recognition of Executive authority.  22 U.S.C. § 211a (“The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic and consular officers of the United States and by such other employees of the Department of States . . . .”).

Although Congress often has recognized the authority of the Executive to regulate the issuance of passports, this obviously does not confirm that the Executive retains exclusive control over all matters relating to passports.  Indeed, the history of congressional legislation in this area suggests otherwise.  *See, e.g.*, 22 U.S.C. § 211a (restricting the Executive department from designating a passport as restricted for travel “[u]nless

authorized by law"). It is clear, however, that Congress lacks the power to interfere with a passport policy adopted by the Executive in furtherance of the recognition power. Appellant Zivotofsky does not dispute this. Rather, Zivotofsky contends that the passport rules regarding Israel do not embody a policy in furtherance of the Executive's recognition power. Zivotofsky's position fails. The record in this case supports the Secretary's claim that the policy relating to the designation of Jerusalem on passports lawfully "govern[s] the question of recognition." *Pink*, 315 U.S. at 229.

"The status of Jerusalem is one of the most sensitive and long-standing disputes in the Arab-Israeli conflict, having remained unsettled since 1948." Appellee's Br. at 6. The United States has long refrained from recognizing Jerusalem as a city located within the sovereign state of Israel. *See* Defendant's Responses to Plaintiff's Interrogatories, *reprinted in* Joint Appendix ("J.A.") 56-57. Instead, United States policy since the Truman Administration has been "to promote a final and permanent resolution of final status issues, including the status of Jerusalem, through negotiations by the parties and supported by the international community." *Id*. at 57. "U.S. Presidents have consistently endeavored to maintain a strict policy of not prejudging the Jerusalem status issue and thus not engaging in official actions that would recognize, or might be perceived as constituting recognition of, Jerusalem as either the capital city of Israel, or as a city located within the sovereign territory of Israel." *Id*. at 59. These points are uncontested.

The Secretary's rules regarding the designation of Jerusalem on passports obviously aims to further the United States' policy regarding the recognition of Israel. The State Department's policies and procedures for preparing passports and reports of birth are outlined in its Foreign Affairs Manual ("FAM"). J.A. 376. The FAM includes a "Birthplace Transcription Guide," which details the "acceptable name and spelling for specific

countries and territories to be used in U.S. passports," in accordance with United States policy. J.A. 381. The rules provide that, as a general matter, the country recognized by the United States as having sovereignty over the place of birth of a passport applicant is recorded on the passport. *See* 7 FAM 1383.5-4, J.A. 378. However, "[w]here the birthplace of the applicant is located in territory disputed by another country, the city or area of birth may be written in the passport . . . if shown on the application and if included for use on the birthplace transcription guide." 7 FAM 1383.5-2, J.A. 377. There are special rules for Jerusalem because it is a disputed territory. For citizens born after 1948 in Jerusalem, the Birthplace Transcription Guide instructs that only "Jerusalem" should be recorded as the place of birth. *See id.* at 1383.1, J.A. 376, 387; 7 FAM 1383.5-6, J.A. 379. The Guide specifically indicates that the official is not to write "Israel" or "Jordan." J.A. 387. The Guide further instructs that Israel "[d]oes not include Jerusalem or areas under military occupation," and Jordan "[d]oes not include Jerusalem." *Id.* These rules plainly implement the Executive's determination not to recognize Jerusalem as part of any sovereign regime.

Zivotofsky contends that the "designation of a passport holder's place of birth does not involve the 'recognition of foreign sovereigns.'" Appellant's Br. at 27. This argument misperceives the issues in this case. As noted above, the recognition power is "not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." *Pink*, 315 U.S. at 229. The rules regarding the designation of Jerusalem are part of the Executive's overarching policy governing the recognition of Israel.

Zivotofsky also claims that the "'birthplace' entry on a passport . . . is nothing more than one means of identifying the passport-holder." Appellant's Br. at 37. This attempt to

downplay the significance of a passport is futile. As the Supreme Court has said, "[a] passport is, in a sense, a letter of introduction in which the issuing sovereign vouches for the bearer." *Agee*, 453 U.S. at 292. It is a "political document" that is "addressed to foreign powers," "by which the bearer is recognised, in foreign countries, as an American citizen." *Id.* (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 698 (1835)). A "political document" indicating that a person born in Jerusalem is from the sovereign nation of Israel misstates the United States' position on the recognition of Israel. So long as the Executive remains neutral on the question of Jerusalem, the Secretary surely may adopt polices declining to issue official documents that suggest otherwise.

Finally, Zivotofsky argues that, because the Secretary's passport rules concerning Jerusalem have only a "negligible impact on American foreign policy," the rules cannot be viewed as policy governing the recognition of Israel. Appellant's Br. at 33. The Secretary responds by pointing to evidence of the international reaction to the enactment of § 214 in 2002. According to the State Department, "Palestinians from across the political spectrum strongly condemned the Jerusalem provisions of the [Act], interpreting those provisions as a reversal of longstanding U.S. policy that Jerusalem's status should be determined by Israel and the Palestinians in final status talks." J.A. 398-99. One need not assess the international reaction to § 214 to find that the Secretary's rules regarding the designation of Jerusalem on passports aims to further the United States' policy of neutrality on the question of Jerusalem. It is obvious. The Executive's policy is not to prejudge the status of Jerusalem, and any official statement to the contrary impinges upon the Executive's prerogative. The Executive has the *exclusive* authority to implement policies in furtherance of the recognition power and this court has no authority to second-guess the Executive's judgment when, as here, it is clear that the disputed policy is in furtherance of the recognition power.

### C. Section 214(d) is a Mandatory Statutory Provision

The Secretary also argues that "Section 214(d) constitutes only a legislative recommendation – not a command – to the Executive Branch with respect to recognition of sovereignty over Jerusalem," Appellee's Br. at 20, and therefore there is no reason for this court to opine on its constitutionality. The District Court rejected this argument, finding that "it is difficult to construe Section 214(d) as anything but mandatory." *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 511 F. Supp. 2d 97, 105 (D.D.C. 2007). This is an understatement. Section 214(d) states, "[T]he Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." As appellant aptly notes, "section 214(d) is as mandatory as a statute can be." Appellant's Reply Br. at 7. The words of the statute make it plain that "Congress was fully aware when it enacted the law that the Secretary of State was acting differently than Congress wanted him to act. It enacted subsection (d) with the specific intent of altering the State Department practice." *Id.* at 8.

Section 214(d) is plainly mandatory. The provision dictates that the Secretary *shall* record Israel as the place of birth upon the request of a citizen who is born in Jerusalem and entitled to a United States passport. "Shall" has long been understood as "the language of command." *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935); *see also Miller v. French*, 530 U.S. 327, 337 (2000) (referring to the "mandatory term 'shall'"); *Ass'n of Civilization Technicians, Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

There are rare exceptions to this rule that apply only where it would make little sense to interpret "shall" as "must." *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005) (declining to read "shall" as mandatory in statute intended to

give local police broad powers to enforce domestic abuse restraining orders in light of the "well established tradition of police discretion"). There is no evidence in this case that the legislature intended "shall" in § 214(d) to mean anything other than "must." Indeed, when § 214(d) is read in conjunction with the title of § 214 – "*United States Policy with Respect to Jerusalem as the Capital of Israel*" – there can be little doubt about Congress' intent. This conclusion is bolstered by reference to the language in § 214(a), where Congress merely "*urges* the President . . . to immediately begin the process of relocating the United States Embassy in Israel to Jerusalem." Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 214(a), 116 Stat. 1350 (2002). Given the structure of the statute, Congress obviously understood the difference between an advisory provision and a statutory command. *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005) (juxtaposing the permissive "may" with the mandatory "shall"). Section 214(d) is undoubtedly mandatory.

The Secretary also argues that "Section 214(d) should be interpreted as advisory to avoid constitutional doubt." Appellee's Br. at 35. However, because the statute is unambiguous, the canon of constitutional avoidance does not apply in this case. *Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."); *United States v. Albertini*, 472 U.S. 675, 680 (1985) ("Statutes should be construed to avoid constitutional questions, but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature."). The congressional command of § 214(a) is clear and unmistakable; therefore, this court is obliged to render a decision on its constitutionality.

**D. Section 214(d) Unconstitutionally Infringes the President's Exclusive Power to Recognize Foreign Sovereigns**

The final question in this case is whether § 214(d) of the Foreign Relations Authorizations Act, which affords Zivotofsky a statutory right to have "Israel" listed as the place of birth on his passport, is a constitutionally valid enactment. Given the mandatory terms of the statute, it can hardly be doubted that § 214(d) intrudes on the President's recognition power. In commanding that the Secretary *shall* record Israel as the place of birth upon the request of a citizen who is born in Jerusalem and entitled to a United States passport, the statute plainly defies the Executive's determination to the contrary. As noted above, the rules adopted by the Secretary of State explicitly ban government officials from recording "Israel" as the place of birth for citizens born in Jerusalem. Section 214(d) effectively vitiates the Executive's policy.

Zivotofsky argues that § 214(d) cannot be seen to interfere with the Executive's recognition power, because the statute here is no different from another uncontested legislative action taken by Congress with respect to Taiwan. In 1994, Congress enacted a provision requiring that, "[f]or purposes of the registration of birth or certificate of nationality of a United States citizen born in Taiwan, the Secretary of State shall permit the place of birth to be recorded as Taiwan." Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 132, 108 Stat. 382 (1994) (as amended by State Department: Technical Amendments, Pub. L. No. 103-415, § 1(r), 108 Stat. 4299, 4302 (1994)). This example is inapposite. Following the enactment of the statute covering Taiwan, the State Department determined that the congressional provision was consistent with the United States' policy that the People's Republic of China is the "sole legal government of China" and "Taiwan is a part of China." U.S. Department of State Passport Bulletin 94-12 (Nov.

7, 1994), J.A. 142-43. Because listing "Taiwan" did not contravene the President's position regarding China's sovereignty, the State Department allowed American citizens born in Taiwan to record "Taiwan" as their place of birth. *See id*. The present case is different from the Taiwan example. The State Department here has determined that recording Israel as the place of birth for United States citizens born in Jerusalem misstates the terms of this country's recognition of Israel.

The more important point here is that the President has the exclusive power to establish the policies governing the recognition of foreign sovereigns. The Executive may treat different situations differently, depending upon how the President assesses each situation. These are matters within the exclusive power of the Executive under Art. II, § 3, and neither Congress nor the Judiciary has the authority to second-guess the Executive's policies governing the terms of recognition.

"[I]t remains a basic principle of our constitutional scheme that one branch of the government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). In my view, the bottom line of the court's judgment in this case is inescapable: "Section 214(d) is unconstitutional. Article II assigns to the President the exclusive power to recognize foreign sovereigns, and Congress has no authority to override or intrude on that power." Appellee's Br. at 21. Section 214(d) impermissibly intrudes on the President's exclusive power to recognize foreign sovereigns. Because appellant Zivotofsky has no viable cause of action under § 214(d), I concur in the judgment.